**FILED**

J:N  JUL X 6 2007
JuLO6, 2007
**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JOSEPH ZERGER, On Behalf of Himself and All Others Similarly Situated, ) ) | No. |
| ) ) ) | <u>CLASS ACTION</u> |
| Plaintiff, ) ) | |
| vs. ) ) | |
| MIDWAY GAMES INC., STEVEN M. ALLISON, JAMES R. BOYLE, MIGUEL IRIBARREN, THOMAS E. POWELL and DAVID F. ZUCKER, ) ) ) ) ) | 07cv3797<br>JUDGE COAR<br>MAG. JUDGE COLE |
| ) | |
| Defendants. ) ) | |
| ) | <u>DEMAND FOR JURY TRIAL</u> |

## COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## JURISDICTION AND VENUE

1.     Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 (the "1934 Act"). The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

2.     Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District and Midway Games Inc. ("Midway" or the "Company") is headquartered and conducts substantial business in this District.

## NATURE OF THE CASE

3.     This is a securities class action on behalf of all purchasers of the common stock of Midway between August 4, 2005 and May 24, 2006 (the "Class Period"), against Midway and certain of its officers and directors for violations of the 1934 Act.

4.     Midway develops and publishes software for major video game systems. During the Class Period, defendants assured investors that Midway would perform as expected in the fourth quarter of 2005. In fact, the Company did not perform as expected because defendants had decided to lay off 8% of the Company's workforce and engage in costly restructuring. Before the full costs of these decisions were made public, however, defendants dumped over $14 million of their shares on the open market within three weeks of one another. When the truth was revealed, unsuspecting shareholders suffered terrible losses. Even then, defendants continued to mislead investors by portraying the Company's cash position as strong. Finally, on May 24, 2006, defendants announced that they would have to sell $75 million in convertible notes that would be highly dilutive to current shareholders in order to raise cash, once again causing Midway's stock price to plummet and investors to suffer massive losses.

## THE PARTIES

5.     Plaintiff Joseph Zerger purchased Midway common stock as described in the attached certification and was damaged thereby.

- 1 -

6.     Defendant Midway is a corporation headquartered in Chicago, Illinois.

7.     Defendant Steven M. Allison ("Allison") was Midway's Senior Vice President of Marketing and Chief Marketing Officer during the Class Period.

8.     Defendant James R. Boyle ("Boyle") was Midway's Vice President of Finance, Controller, and Assistant Treasurer during the Class Period.

9.     Defendant Miguel Iribarren ("Iribarren") was Midway's Vice President of Publishing during the Class Period.

10.    Defendant Thomas E. Powell ("Powell") was Midway's Executive Vice President and Chief Financial Officer during the Class Period.

11.    Defendant David F. Zucker ("Zucker") was Midway's President and Chief Executive Officer during the Class Period.

12.    The defendants named in ¶¶7-11 are referred to herein as the "Individual Defendants."

### SCIENTER, FRAUDULENT SCHEME AND COURSE OF BUSINESS

13.    Midway's top officers and directors, including the Individual Defendants, are liable for making false statements, including those by Midway's executive officers. Defendants' fraudulent scheme and course of business operated as a fraud or deceit on purchasers of Midway common stock in that: (i) it temporarily deceived the investing public regarding Midway's prospects and business; (ii) it artificially inflated the price of Midway's common stock; and (iii) it caused plaintiff and other members of the Class to purchase Midway common stock at inflated prices.

### FALSE AND MISLEADING STATEMENTS
### ISSUED DURING THE CLASS PERIOD

14.    On August 4, 2005, defendants held a conference call which included the following statements:

David Zucker – *Midway Games - President, CEO*

- 2 -

\*       \*       \*

Turning to guidance. Partially due to the shortfall from the second quarter results, and also from our decision to move the release of our next premium PC title, The Rise and Fall Civilizations at War into the first quarter of 2006, we're revising our full year revenue guidance to approximately 200 million, down from previous estimate of with 225 million, and increasing our net loss to approximately 60 million from our previous estimate of 47 million.

\*       \*       \*

In the fourth quarter we expect to release Blitz: the League, LA Rush, Ed, Ed, and Eddy: the Misadventures, and Gauntlet: Seven Sorrows. In addition we are very excited to be debuting two titles on the PlayStation Portable. The first is Mortal Kombat: Deception Unchained, bringing our biggest franchise to the PSP. We'll also bring a collection of the classic games to the PSP in Midway Arcade Treasures: Extended Play. Both of these titles will take full advantage of the PSP's capabilities, including wireless and head to head game play.

15.    On November 1, 2005, Midway issued a press release which stated:

MIDWAY ANNOUNCES EXPECTED 2005 THIRD QUARTER RESULTS

. . . Midway Games Inc. today announced expected revenue and net loss for the third quarter ended September 30, 2005, and provided revised guidance for 2005.

\*       \*       \*

For the year ending December 31, 2005, Midway has revised its net revenue expectations in part due to re-scheduling certain products into 2006 from the fourth quarter of 2005, as well as lower-than-expected retailer reorders for several recently released titles, including *The Suffering: Ties That Bind* and *L.A. RUSH.* As such, for the year ending December 31, 2005, the Company now expects net revenues of approximately $145 million, compared with the Company's previous estimate of net revenue of $200 million. Additionally, the Company now expects a 2005 full year net loss of approximately $95 million compared with its prior guidance for a net loss of approximately $60 million.

16.    On November 7, 2005, Midway issued a press release which stated:

Midway Games Inc. today announced results of operations for the three month period ended September 30, 2005. The Company also updated its guidance for the quarter and year ending December 31, 2005.

\*       \*       \*

OUTLOOK

For the quarter ending December 31, 2005, the Company expects net revenue of approximately $65 million, with a net loss of approximately $20 million. For the fourth quarter, Midway has already released *L.A. RUSH* for PlayStation 2 and Xbox, *Blitz: The League* for PlayStation 2 and Xbox, *Midway Arcade Treasures 3* for GameCube, and *Ed, Edd n Eddy: The MisEdventures* for PlayStation 2, Xbox, GameCube, and GameBoy Advance. During the remainder of the quarter, the Company also expects to release *Gauntlet: Seven Sorrows* for PlayStation 2 and Xbox in North America, *Earth 2160* for PC, Midway Arcade Treasures: Deluxe Edition for PC, and its first PlayStation Portable (PSP) title *Midway Arcade Treasures: Extended Play*. Midway now expects to release *Mortal Kombat: Deception Unchained* for the PSP during the first quarter of 2006 and *Gauntlet: Seven Sorrows* in Europe during the first quarter of 2006.

For the year ending December 31, 2005, Midway has revised its revenue expectations in part due to re-scheduling the release of certain products into 2006 from the fourth quarter of 2005, as well as lower-than-expected retailer reorders for several recently released titles, including *The Suffering: Ties That Bind* and *L.A. RUSH*. As such, for the year ending December 31, 2005, the Company now expects net revenues of approximately $145 million, compared with the Company's previous estimate of $200 million. Additionally, the Company now expects a net loss of approximately $95 million, an increase from the Company's prior expectation of a net loss of approximately $60 million.

17.     On a November 7, 2005, defendants held a conference call which included the

following statements:

David Zucker – *Midway Games - Chief Executive Officer*

*           *           *

[W]e're revising our 2005 full-year revenue estimates from approximately $200 million to approximately $145 million. With a net loss of approximately 95 million compared with our prior guidance of 60 million. This revision is partly or partially due to our decision to move some Q4 titles out of this fiscal year, as in Mortal Kombat: Deception Unchained for the Sony PSP, as well as the European launch of Gauntlet. Also our reduced expectations for the performance of our titles including L.A. Rush, and lower than expected reorders for the Suffering in North America.

While we're disappointed with the sale performance, our expectations are flat year-over-year second half revenue growth despite the competitive environment. For the quarter ending December 31, 2005, we're expect [sic] net revenue of approximately $65 million, with a net loss of approximate [sic] 20 million. So far this quarter we've launched LA Rush, and Blitz – The League, at adventures for multiple platforms. The remainder of the quarter, we expect to release Earth 2160 for the PC in North America and the Gauntlet - Seven Sorrows, for Play Station 2 and XBox in

North America. We expect to ship later in the quarter. This release timing reduce [sic] the opportunity to book reorder sales during the quarter.

In addition, we also expect to release our first PSP Title, Midway Arcade Treasures Extended Play. Although it will also go out late in the quarter. In mid October, we launch Blitz — The league, and were thrilled about the buzz it's form [sic] around the title. And the football [sic] game that Midway has always wanted to make. Without the NFL restrictions allowed us to professional football [sic] better than any alternatives. This [has] gotten significant national press coverage including segments for entire shows, and ESPN, ESPN2, VH1, CNN, NBC, CBS, Howard Stern radio and other various other consumer print new menus in TV and radio broadcast outlets. This also generates strong [gamer] reviews, including an 8.6 out of 10 on game stop.com. Best football you'll play all year. We're encouraged by Blitz sales during the first two weeks following it's launch. It's been a top-ten seller for the XBOX and PS2 at most retail outlets in North America.

Performing well at mass market retailers like Wal-Mart. Blitz [has] been nominated for the best sports team award in [the] Spike TV Video Game awards. And the positive response to Blitz, valued our decision to focus our sports development toward our competency in over the top styles sports video games and away from simulation style games over the past 19 months. We're excited about the progress we're making on the sequel to our million-unit plus selling NBA baller which launched in April of 2004. NBA Baller phenom, the next version of the franchises is targeted for the first half of 2005. More to say about it in the near future.

Another bright spot in the second half of the year is the success we're realizing from the plan put in place from over a year-ago to expand our European operation. In addition to bringing industry veteran martins piece [sic] to over see in Europe this year, we brought in our own distribution organization in Germany and [are] in the process of building our own sales and marketing organization in France. Our performance in Europe isn't solid and expect to be virtually unplanned for the remainder of the year. We expect the bulk of our revenue, under performance in Q4 to be attributal [sic] to North America.

Where as evidenced by recent MPD Data we are finding that the [console] of transition is beginning to have an affect [sic] on Legacy System software sales and retailer behavior. We believe the market is clearly anticipating the launch of next generation systems and Microsoft [will] be on target for the launch the XBOX 360 this fall. Sales of Software for legacy systems are softer than most industry participants had initially expected. Going forward, we intend to focus on building a business that can thrive during the [console] transition. And provide a foundation of success in the next [console] cycle. Over the last two years, the team at Midway has set its sites on the next [console] cycle.

*       *       *

Our goal is to become a top [tier] publisher in the next [console] cycle.

To achieve this goal, we've concentrated on two main areas, our prices own processes [sic] and building our product portfolio. We restructured our organization to focus all of our internal teams . . . on a common goal that will enable us to cost effectively produce high-quality games while building a technological foundation that will make us one of the most efficient producers in the industry.

*       *       *

We've set out to build an organization with the right people, processes, and tools to become the next. Due to long lead times for game development and pipelines and internal resources organically over time results will not be seen immediately. We expect to end the year [with] between $95 to $100 million in cash on the balance sheet.

We remain excited about the prospects over the next few years and the belief we have in place now for the internal development capabilities, financial resources, marketing skills and strategic relationships that provide the basis in the upcoming [console] cycle. That concludes my prepared remarks. Operator please open the line for questions.

*       *       *

Tom Powell – *Midway Games - Chief Financial Officer*

All right. So in terms of Blitz, Blitz has been certainly a bright spot for us and in other [sic] a life challenging second half of the year here. Blitz has third weekend of sales, it has been a top five or top ten depending on what retailer it's at. Most encouraging to us, it's actually been growing – on a week-over-week basis. So we are . . . doing very well at to [sic] particular mass market retail accounts. So we are excited about Blitz. . . . But really looking ahead, we are, as we've talked about making some fairly big investments in multi-genre action games which are really the go anywhere, do anything, what the game player expects to be able to do in that game world that he or she can do. They are harder to make, more ambitious to make, we really believe that if you look forward, those kinds of games are going to be commanding a bigger and bigger percentage of the market place out there, and that's our strategy.

18.     The above statements were false and misleading and artificially inflated the price of

Midway stock because defendants had decided to engage in lay-offs and restructuring that would

cost Midway $17.8 million in the fourth quarter of 2005 and prevent the Company from achieving

the results projected for the fourth quarter of 2005 and fiscal 2005.

19.     On December 16, 2005, defendants filed a Form 8-K with the SEC which stated:

**Item 2.05.  Costs Associated with Exit or Disposal Activities.**

(a)      On December 14, 2005, the Company's Board of Directors committed to a plan to reduce the Company's cost structure and increase product development synergy and efficiency. To that end the Company has instituted strategic workforce reductions that it expects will allow the Company to better leverage resources in a manner consistent with its strategy to increase the quality and size of its internal product development capabilities. As such, the Company anticipates that it will reduce headcount by between 71 and 96 positions, which represents a reduction of approximately 8-11% of the Company's global workforce. The Company expects that the majority of the headcount reduction will occur by the end of 2005, with the remainder of headcount reduction planned for 2006. Despite these reductions, the Company grew its overall internal product development employee base in 2005 and intends to continue to grow its product development employee base in 2006.

(b)      In conjunction with this plan, the Company anticipates that it will incur costs associated with these activities as follows:

| | |
|---|---|
| Employee related costs | $2 million |
| Asset impairment | $8 million |
| Exit and other costs | $3 million |

(c)      Therefore, the Company expects to incur pre-tax charges related to these activities in the fourth quarter 2005 of approximately $13 million.

(d)      Of these amounts, the Company expects to incur future cash expenditures related to these activities of approximately $4 million.

**Item 7.01. Regulation FD Disclosure.**

The Company now expects to take charges unrelated to the plan description above of approximately $7 million for the fourth quarter of 2005 due to (1) the accelerated amortization and writedowns of capitalized product development costs associated with both current and future releases; (2) inventory writedowns; and (3) bad debts. These non-cash charges were not previously anticipated when the Company provided its most recent guidance for the year and quarter ending December 31, 2005.

Information in this Current Report that is being furnished pursuant to Item 7.01 shall not be deemed "filed" pursuant to Item Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that Section. Accordingly, the information in Item 7.01 of this Current Report will not be incorporated by reference into any registration statement filed by the Company under the Securities Act of 1933, as amended, unless specifically identified therein as being incorporated by reference.

20.      In response to this announcement, Midway's stock price declined from $23.25 to

$20.97 in the next two trading days, as artificial inflation partially dissipated from the stock price.

- 7 -

The price of Midway's stock remained artificially inflated however, because defendants continued to deceive investors. Indeed, defendants' disclosure was itself false and misleading and artificially inflated the price of Midway stock because defendants knew that the costs of the planned layoffs and restructuring would significantly exceed $13 million. Indeed, the layoffs and restructuring were by defendants' design and would be incurred within two weeks of defendants' statement.

21.     On December 30, 2005, *Reuters* reported:

Shares of video game publisher Midway Games Inc. dropped nearly 4 percent on Friday, after majority shareholder Sumner Redstone disclosed he had shifted part of his holdings to a new company controlled by his daughter.

The disclosure on Thursday was a "non event," Michael Pachter, a video game analyst at Wedbush Morgan Securities, said on Thursday.

Viacom Inc. chairman Redstone, who directly and indirectly holds 89.25 percent of the game company behind the Mortal Kombat franchise, on Thursday said entities he controls had pledged nearly 33 million shares of Midway to a newly created company to secure a $425.2 million debt to Citicorp.

The new company, called Sumco, will be controlled by his daughter Shari Redstone, and will be responsible for servicing the debt, the filing said.

"It's like a shifting of loan repayment responsibility, collateralized by Midway shares," Pachter said.

The filing said Redstone executed the transaction to "engage in tax and estate planning and reduce certain personal indebtedness."

Redstone's "beneficial ownership of the common shares of the issuer remains unchanged as a result of the transactions," the filing said, referring to Midway shares.

Midway shares, which have nearly doubled in price this year, fell 70 cents, or 3.48 percent, to $19.41 on the New York Stock Exchange in afternoon trading.

22.     On February 23, 2006, Midway reported its fourth quarter and year end 2005 results:

MIDWAY REPORTS 2005 Q4 AND YEAR END RESULTS

. . . Midway Games Inc. today announced results of operations for the fourth quarter and full year ended December 31, 2005. The Company also provided guidance for the quarter ending March 31, 2006 and the year ending December 31, 2006.

FOURTH QUARTER RESULTS

Net revenues for the 2005 fourth quarter were $69.8 million, down 9.6% from 2004 fourth quarter net revenues of $77.2 million. The 2005 fourth quarter loss applicable to common stock was $37.8 million, or a loss of $0.42 per basic and diluted share, compared with a 2004 fourth quarter income applicable to common stock of $17.6 million, or $0.19 per diluted share. The 2005 fourth quarter results include a $10.8 million charge related to the restructuring announced in December 2005.

*       *       *

FULL YEAR RESULTS

Net revenues for the year ended December 31, 2005, were $150.1 million, down 7.1% from the $161.6 million for the year ended December 31, 2004. The loss applicable to common stock for the year ended December 31, 2005, was $112.8 million, or $1.30 per basic and diluted share, compared to a loss applicable to common stock of $24.7 million or $0.34 per basic and diluted share for the year ended December 31, 2004. The results for the year ended December 31, 2005, include a $10.8 million charge related to the restructuring announced in December 2005.

*       *       *

OUTLOOK

For the year ending December 31, 2006, Midway expects revenues to grow approximately 3% to $155 million with a reduction in net loss to approximately $66 million, which includes approximately $3 million of stock option expense. For the first quarter ending March 31, 2006, the Company expects net revenues of approximately $13 million, with a net loss of approximately $22 million. For the first quarter of 2006, Midway has already released, *Midway Arcade Treasures: Deluxe Edition* and *L.A. RUSH*, both for the PC, and we anticipate releasing *Midway Arcade Treasures: Extended Play* for PSP and *Gauntlet: Seven Sorrows* for PlayStation 2 and Xbox in Europe only, and *NBA Ballers: Rebound* for PSP in late March.

23.     On a February 23, 2006, defendants held a conference call which included the

following statements:

Tom Powell – *Midway Games – CFO*

Revenues for the quarter totaled $69.8 million which was slightly above our expectations. Revenue mix by platform was 58% on PlayStation 2, 28% on the Xbox, and approximately 3% for each of the PC, GameCube, PlayStation Portable, Game Boy Advance, and licensed royalties. Our international business contributed approximately 17% of the revenues and for the quarter the net loss was $37.8

million, which was slightly favorable to our expectations, taking account of the charge of $10.8 million associated with the restructuring of our product development organization, and the charge of approximately $7 million, due primarily to write downs of capitalized product development costs for both current and future releases, both of which were announced in our 8-K on December 16 of 2005.

*    *    *

Tom Andrews – *Cowen – Analyst*

And finally, can you give us any color on what your cash burn rates, on a quarterly basis you expect to be for the current year?

Tom Powell – *Midway Games – CFO*

Sure, we anticipate that overhead for '06 will be largely the same as 2005, which ran about $8.5 million per quarter for both the sales and marketing overhead, as well as the corporate admin functions. And then for product development we expect to spend slightly less than $30 million on a quarter on average. That should give you a good sense for our overhead cash burn rate.

*    *    *

Heath Terry – *Credit Suisse – Analyst*

Thank you. I was wondering you if you could [talk] a little bit about – just going off of your net income guidance for this year, which I know isn't a perfect proxy, but using that it looks like you're due to burn through two thirds of your cash balance. What kind of capital means are you going to have this year? What do you think the proper working capital balance for the Company is and how should we kind of think about that and I guess how is that kind of coloring the growth plans for the Company?

David F. Zucker – *Midway Games – President, CEO*

We're look [sic] at over the next two years here and including fully funding our aggressive next generation titles we have in development. We feel very good about our cash position. In terms in of our working capital, Tom, you want to talk about that?

Tom Powell – *Midway Games – CFO*

Sure, we specifically put together a multi-year plan, as David mentioned, with a focus on balancing our growth as well as avoiding additional capital financing, or financing initiatives. So, that's the way we looked at our multi-year plan, and we think we've found a good balance [for] the two of them that accomplishes both and provides adequate working capital to fund our development projects. Certainly if we stray significantly from that plan we would have to revisit that assumption, but right now we feel good about the level of cash we have.

- 10 -

24.    In response to this announcement, Midway's stock price declined from $10.87 to $9.94 the next day, as the artificial inflation partially dissipated from the stock price. The price of Midway's stock remained artificially inflated however, because defendants continued to deceive investors concerning the Company's cash needs.

25.    On May 3, 2006, Midway issued a press release which stated:

Midway Games Inc. today announced results of operations for the three month period ended March 31, 2006. The Company also confirmed its prior full year guidance and provided revenue and earnings guidance for the second quarter ending June 30, 2006.

FIRST QUARTER RESULTS

Net revenues for the 2006 first quarter were $15.4 million, an 11% increase over 2005 first quarter net revenues of $13.8 million. The 2006 first quarter loss applicable to common stock was $22.6 million which includes $0.8 million of stock option expense, or a loss of $0.25 per share, compared with a 2005 first quarter loss applicable to common stock of $16.0 million or a loss of $0.19 per share.

                        *        *        *

OUTLOOK

For the quarter ending June 30, 2006, Midway expects net revenues of approximately $25 million, with a net loss of approximately $32 million. For the second quarter, Midway has released *NBA Ballers: Phenom* for PlayStation 2, *Rampage: Total Destruction* for PlayStation 2 and Nintendo GameCube, and expects to release *NBA Ballers: Rebound* for the PSP this week. During the remainder of the quarter, the Company also expects to release *Rise & Fall: Civilizations at War* for PC and *MLB Slugfest 2006* for PlayStation 2 and Xbox. For the year ending December 31, 2006, Midway continues to expect revenues of $155 million with a net loss of approximately $66 million, which includes approximately $3 million of stock option expense.

Mr. Zucker commented, "Although 2006 continues to be a transition year for the industry, we are committed to showing modest revenue growth in spite of the overall industry downturn. We are focused on our goal of increasing our market share early in the new console cycle. To that end, we are concentrating our resources on developing what we believe will be some of the best technology and highest-potential intellectual properties in the industry for the next generation consoles. We continue to make great strides in honing our development and marketing processes, and we are excited to be able to show in greater detail some of our progress at the 2006 Electronic Entertainment Expo (E3) in Los Angeles next week."

26.     On May 3, 2006, defendants held a conference call which included the following

statements:

> Daniel Ernst – *Hudson Square Research – Analyst*
>
> . . . First of all, maybe update us on where you think cash will break even on a
> quarterly revenue basis is.
>
> *     *     *
>
> Tom Powell – *Midway Games – CFO*
>
> Sure in terms of cash flow break even, as you are probably aware, a number
> of factors come into play. This year we're in a situation where the pricing isn't as
> favorable as it might be as you get into 2007, which will certainly provide some
> added gross margin impact. But generally speaking, in the $75 million range, you
> expect to get towards the cash flow break even.
>
> *     *     *
>
> Edward Willims – *Harris Nesbitt – Analyst*
>
> Okay. And then going to the balance sheet for a moment, the cash burn for
> the year. Is there a number you're kind of, you can discuss or what your thought is at
> that, with that line item?
>
> Tom Powell – *Midway Games – CFO*
>
> Well, I think we gave you the general parameters of what our overhead costs
> are. We're looking to spend in the neighborhood of 110 to $115 million on product
> development this year on a cash basis. And then our corporate as well as sales and
> marketing overhead costs will run about 30 million for the year. So then the revenue
> less costs would back into the cash use.

27.     The above statements were false and misleading and artificially inflated the price of

Midway stock when made because, contrary to defendants' representations, the Company's cash

needs were extreme. Indeed, the Company was forced to announce a dilutive note offering to raise

cash just three weeks later.

28.     On May 24, 2006, Midway issued a press release which stated:

> Midway Games Inc. announced today that, on May 23, it priced the offering of its
> $75 million of Convertible Senior Notes due 2026. The notes are general unsecured
> obligations of Midway and will only be offered and sold to qualified institutional
> buyers in accordance with Rule 144A under the Securities Act of 1933.

The notes will bear interest at a rate of 7.125% per year and will be convertible into Midway common stock, at the option of the holders, at a conversion rate of 92.0810 shares per $1,000 principal amount of the notes, which is equivalent to an initial conversion price of approximately $10.86. There may be an increase in the conversion rate of the notes under certain circumstances.

Holders may require Midway to purchase for cash all or part of their notes on May 31, 2010, May 31, 2016, and May 31, 2021, or upon the occurrence of certain events, at 100% of the principal amount of the notes plus accrued and unpaid interest and additional interest, if any, up to, but not including, the date of purchase. Midway may redeem for cash all or a portion of the notes at any time on or after June 6, 2013, at 100% of the principal amount of the notes plus accrued and unpaid interest and additional interest, if any, up to, but not including, the date of redemption.

The offering is expected to close on May 30, 2006, subject to customary closing conditions.

Midway intends to use the net proceeds from the offering for general corporate purposes, including working capital and capital expenditures. Midway may also use a portion of the net proceeds to fund possible future acquisitions of, or strategic alliances with, development companies or other companies involved in the development or production of video games.

29.     On May 26, 2006, the *Chicago Tribune* reported:

Midway Games Inc. stock tumbled to $7.39. The Chicago-based maker of video games said Wednesday it will sell $75 million in senior notes that can be converted to common shares. Existing holders' stakes could be diluted when the notes are converted.

30.     In response to this announcement, Midway's stock price declined from $9.87 to $7.39

the next day, as the artificial inflation dissipated from the stock price.

## POST CLASS PERIOD DEVELOPMENTS

31.     On November 1, 2006, *BusinessWeek online* reported:

Late last year, after a seven-month surge had nearly tripled shares in Midway Games (MWY), CEO David Zucker apparently decided that it was time to lighten his load. On Dec. 8, he filed notice with the SEC that he had set up a prearranged trading plan to sell off some of the shares he had accumulated in the Chicago-based company, best known for its popular Mortal Kombat video game.

And unload Zucker did -- with a vengeance. His first trades came on Dec. 19, with the sale of 50,000 shares, bringing in proceeds of $1.1 million. And over the course of the next three weeks, Zucker sold another 50,000 shares virtually every trading day, taking a break only for Christmas and New Year's. By Jan. 6, the date of

his last trade, Zucker had sold off some 650,000 shares, reaping proceeds of $12.9 million. He finished with just 163,000 shares remaining, according to SEC filings.

Increased Scrutiny

Zucker's timing couldn't have been more fortuitous. Less than a week after he set up his automatic trading program, Midway's board approved a plan to take charges of $20 million and cut the company's workforce by up to 11%. When that plan was made public late on Dec. 16, a Friday afternoon, Midway's shares began a precipitous slide. From a peak of $23.26 on Dec. 15, its stock fell a stunning 57%, to $9.91, by late February.

It's the sort of insider sale that is drawing increasing scrutiny, because Zucker's trades took place after he filed what is known as a 10b5-1 plan. These prearranged plans, named after the SEC rule in 2000 that authorized them, are designed to let executives sell the shares they have accumulated in their companies without facing charges that they are trading based on their inside knowledge. They provide executives with a "safe harbor" from such charges, but only if they meet several conditions. Most important, executives must set up these plans at a time when they aren't aware of any significant nonpublic information. They also must delineate the dates or the price at which trades should be made in advance, and they must hand over control of the trades to a broker.

But in the face of evidence that insiders who set up prearranged plans appear to be earning outsized gains, such plans are coming under increased scrutiny. A recent study by Stanford Graduate School of Business Assistant Professor Alan Jagolinzer raises questions as to whether insiders are in fact able to tap their inside knowledge when they set up and trade under such plans.

Knowledge Aforethought?

\*       \*       \*

At a conference on the legal and accounting issues surrounding options dating and trading issues sponsored by Stanford's Rock Center for Corporate Governance on Oct. 30, Jagolinzer elaborated on his view that a preliminary analysis of the data appears to show that such trades may not be as random as intended by the SEC's original rule. "The conventional wisdom among investors is that these are 'uninformed' trades by executives made to diversify," Jagolinzer told the Washington [D.C.] gathering. But the sales activity doesn't appear to reflect "random diversification," he says.

A key reason for the higher performance: More often than not, the sales insiders make in such plans take place just ahead of declines in their companies' stocks. In part, that's because they also sell shares in advance of negative earnings news twice as often as they sell ahead of good news. "What this work suggests is that executives who know that their stock will underperform – either because they know specific bad news is coming up or because they think the market has overvalued it – enter into plans and sell a large fraction of their stock," says Jesse Fried, the co-

director of the Berkeley Center for Law, Business & the Economy at the University of California, Berkeley, and the co-author of Pay without Performance: The Unfulfilled Promise of Executive Compensation.

Executive Discretion

Moreover, others argue that some executives appear to be using the plans to rapidly unload stock in a way that runs counter to the original intent of the 10b5-1 rule. When the rule was written, the expectation was that executives would set up plans to trade shares on a regularly scheduled basis over many months – selling, say, 10,000 shares on the first of every month over the course of the following year.

While many executives certainly do that, Jagolinzer's data suggests that others trade more advantageously. "The rule was set up to give executives a safe harbor so that they could make routine sales without having to worry about insider trading every month," says Stanley Sporkin, a former director of the SEC's division of enforcement now with Weil, Gotshal & Manges. "Now it appears to have been turned into something it wasn't designed to do."

Indeed, Mark LoPresti, who tracks insider trading for Thomson Financial, points out that some executives appear to be setting up plans and almost instantaneously using them to sell off big chunks of stock. "People thought these plans would be used to lock in dates well ahead of the trades," says LoPresti. "But that doesn't appear to be the case; executives still have enormous discretion over when to sell."

Curious Patterns

Still, Jagolinzer's results have drawn skepticism from some quarters. Bruce Carton, who monitors shareholder class action suits for proxy advisor Institutional Shareholder Services, says the advance planning and legal complexities involved in setting up plans leaves him unconvinced they are being widely manipulated. "I find it very unlikely; in my experience, you just don't see a team of executives with matching plans," he says. "Everyone does it as a one-off with their own financial advisors."

Jagolinzer agrees that it's difficult to know from the data alone exactly what explains the insiders' higher-than expected returns, and he stresses that his results are preliminary. And none of it necessarily implies anything illegal. Yet he argues that the patterns demonstrated by examining tens of thousands of trades are too strong to simply be attributable to chance. "If executives were initiating plans without any inside information, then you wouldn't expect there to be any noticeable pattern in their performance," he says.

In his presentation at the Stanford conference, Jagolinzer cited an unidentified example to demonstrate the patterns that raise questions: the case of a CEO who announced a plan and then sold a huge chunk of his shares within little more than a few weeks, just ahead of a 50% decline in his company's stock.

Fortunate Timing

Jagolinzer would not identify the company involved, but a search through SEC filings reveals that the sales made by Midway's Zucker appear to match that description. Zucker did not respond to several requests for comment.

Zucker's December trades came just ahead of a market rout as investors reacted poorly to the announced restructuring at the money-losing company. Shareholders also feared that continuing problems at the company might lead to a reduction in the controlling stake held by media mogul Sumner Redstone. Purchases made by Redstone had fueled the shares' rise from $8 to $23 since the spring. In late December, Redstone announced that he had transferred his Midway holdings to a company controlled by his daughter as part of an effort to free himself from debt. The combined concerns quickly led to a rout.

The Midway CEO was not the only company executive who decided to diversify his holdings as the stock hit new highs last December. Three other execs at the gaming company also set up automatic trading plans to sell shares – including two who also set them up in the week before the company's Dec. 16 restructuring announcement, according to SEC filings.

No Comment

Miguel Iribarren, a vice-president in charge of publishing, adopted his plan on Dec. 9; on Dec. 20, he sold 15,000 shares for roughly $316,000. Steven Allison, the senior vice-president of marketing, set up his plan on Dec. 13. He sold 21,250 shares on Dec. 22 for nearly $450,000. James Boyle, a vice-president in finance, adopted a plan on Dec. 19. He sold 15,000 shares on the 21st, bringing in $310,000. None of the three made any further trades in their automatic plans.

On Dec. 20, CFO Thomas Powell sold 40,500 shares for proceeds of $842,000. There are no public filings declaring whether or not his sales took place as part of a trading plan. Insiders are not required to disclose if they've set up 10b5-1 plans, though many do because of the legal protections they offer. None of the executives responded to requests for comment.

As Jagolinzer put it in reference to his unidentified company, "Given the proximity of the trades to the stock decline, this is the type of pattern that makes you scratch your head and ask what is going on."

## LOSS CAUSATION/ECONOMIC LOSS

32.     During the Class Period, as detailed herein, defendants made false and misleading

statements and engaged in a scheme to deceive the market and a course of conduct that artificially

inflated Midway's stock price and operated as a fraud or deceit on Class Period purchasers of

Midway stock by misrepresenting the Company's business.   Later, when defendants' prior

- 16 -

misrepresentations and fraudulent conduct became apparent to the market, Midway's stock price fell precipitously, as the prior artificial inflation came out of the stock price over time. As a result of their purchases of Midway stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

33. Midway's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

34. The defendants are also liable for any false FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false and the FLS was authorized and/or approved by an executive officer of Midway who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

35. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's securities traded in efficient markets;

- 17 -

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiff and other members of the Class purchased Midway common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

36.     At all relevant times, the market for Midway common stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, Midway filed periodic public reports with the SEC;

(b)     Midway regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(c)     Midway's common stock was actively traded in an efficient market, namely the NYSE, under the symbol MWY.

## COUNT I

### For Violation of §10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

37.     Plaintiff incorporates ¶¶1-36 by reference.

38.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

39.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

- 18 -

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Midway common stock during the Class Period.

40.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Midway common stock. Plaintiff and the Class would not have purchased Midway common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

41.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Midway common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

42.     Plaintiff incorporates ¶¶1-41 by reference.

43.     The Individual Defendants acted as controlling persons of Midway within the meaning of §20 of the 1934 Act. By virtue of their positions and their power to control public statements about Midway, the Individual Defendants had the power and ability to control the actions of Midway and its employees. Midway controlled the Individual Defendants and its other officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Midway common stock during the Class Period (the "Class"). Excluded from the Class are defendants, directors and officers of Midway and their families and affiliates.

45.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Midway has more than 91 million shares of stock outstanding, owned by thousands of persons.

46.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the 1934 Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of Midway common stock was artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

47.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

- 20 -

48.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

49.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. Pro. 23;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 6, 2007                    LASKY & RIFKIND, LTD.
                                       LEIGH R. LASKY
                                       NORMAN RIFKIND
                                       AMELIA S. NEWTON


                                       _____
                                       AMELIA S. NEWTON

                                       350 North LaSalle Street, Suite 1320
                                       Chicago, IL 60610
                                       Telephone: 312/634-0057
                                       312/634-0059 (fax)

- 21 -

LERACH COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
MATTHEW P. MONTGOMERY
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt MidwayGames.doc

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Joseph Zerger ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Acquisitions: MWY | Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|---|
| | 8/29/05 | 2000 | $14.41 |
| | 11/23/05 | 1000 | $21.24 |
| | 12/29/05 | 1000 | $20.09 |
| | | | |
| | | | |

| Sales: MWY | Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

MIDWAY GAMES

5.     Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of June, 2007.

Joseph Zerger

- 2 -