**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSEPH ZERGER, On Behalf of Himself** | ) | |
| **and All Others Similarly Situated, YAP** | ) | |
| **GROUP,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No.  07 C 3797** |
| **v.** | ) | |
| | ) | |
| **MIDWAY GAMES, INC., STEVEN M.** | ) | **HONORABLE DAVID H. COAR** |
| **ALLISON, JAMES R. BOYLE, MIGUEL** | ) | |
| **IRIBARREN, THOMAS E. POWELL, and** | ) | |
| **DAVID F. ZUCKER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

The lead plaintiffs in this fraud-on-the-market case have brought suit against several executives of Midway Games, Inc. under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, *see* 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5, *see* C.F.R. § 240.10b-5, alleging that the executives artificially inflated the market value of Midway stock by deceiving the public about the company's financial position.  While the executives rushed to sell their Midway stock at the trumped-up prices their "scheme" temporarily sustained, the lead plaintiffs and other putative class members purchased it—and lost millions when the market eventually learned the truth.  Or so the plaintiffs allege.  The defendants have moved to dismiss the Consolidated Amended Class Action Complaint for failure to state a claim under the stringent pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *See* 15 U.S.C. § 78u-4(b)(1)-(2).  For the reasons stated below, the motion to dismiss is GRANTED.

## <u>FACTS</u>

Andre Pappas and Giancarlo Dimizio ("Plaintiffs") are the lead plaintiffs in this consolidated action against Steven M. Allison, James R. Boyle, Miguel Iribarren, Thomas E. Powell, and David F. Zucker ("Defendants"), all executives of Midway Games, Inc. Plaintiffs purport to represent a class consisting of "all purchasers of the common stock of Midway between August 4, 2005 and May 24, 2005" (the "Class Period"). (Consol. Am. Compl. ¶1.) Between August 29 and November 22, 2005, Pappas purchased a total of 3,300 shares of Midway's common stock; between November 3 and November 23, 2005, Dimizio purchased 4,300 shares. (R. 28, Ex. B at 2.) They voluntarily dismissed their claims against Midway on March 3, 2009, after Midway had filed Chapter 11 bankruptcy on February 13, 2009. (R. 85.)

### *Midway's Business Model*

Midway Games develops and publishes video games. Over the last twenty-plus years, it has published more than 400 video-game titles spanning the home-console, handheld, coin-operated, and PC platforms. (Consol. Am. Compl. ¶2.) Midway focuses its development efforts on creating a large catalog of titles across many of the most popular video-game genres. (*Id.*) In 2001, Midway's management decided to focus exclusively on the home-console and handheld markets. (*Id.*) Midway already had titles available on many major platforms in these markets, including Microsoft's *Xbox*, Nintendo's *Game Cube* and *Game Boy Advance*, and Sony's *PlayStation 2* and *PlayStation Portable*. (*Id.*)

In February 2005, Midway announced its first profitable quarter in five years: for the fourth quarter of 2004, Midway took in $77 million in revenue and posted a net income of $17 million, in large part due to the successful release of the games *Mortal Kombat—Deception* and *Arcade Treasure 2*, as well as its ability to control costs. (*Id.* ¶3.) Midway's continued success

would depend upon its ability to deliver new titles across various platforms in a cost-efficient manner; thus, an important objective for Midway in 2005 was "reasonable growth" in its product-development infrastructure, i.e., attracting and retaining some of the highest quality product developers. (*Id.*) Midway sought to "internally develop[] products due to the favorable profit margin contribution and the ability to leverage . . . products into sequels and derivative products" (*Id.* ¶5) and repeatedly told the market that "robust internal product development resources will be a critical advantage" to Midway in the future. (*Id.* ¶6.)

Accordingly, in 2004-2005, Midway increased its in-house product development team from 330 to 650 employees, in part by acquiring competitors in the interactive-entertainment industry. (*Id.*) Midway acquired Ratbag Holdings Pty. Ltd. in August 2005, and The Pitbull Syndicate in October 2005. (*Id.*) Keeping its focus on in-house development of titles for home-console and handheld platforms, Midway contracted with outside companies to develop titles for its PC catalog, including *Rise & Fall: Civilizations of War*, which was to be developed by Stainless Steel Studios. (*Id.* ¶¶5, 9.)

### Failure of Midway's 2005 Strategy

But all was not well with Midway's business model. After posting a successful fourth quarter in 2004, Midway failed to generate any net income in 2005. (*Id.* ¶4.) Its sustained investment in infrastructure for in-house product development was a significant drain on its capital resources. (*Id.* ¶7.) In September 2005, Midway had to borrow $75 million to fund day-to-day operations. (*Id.*) Throughout the Class Period, however, Defendants repeatedly assured the market that Midway had sufficient working capital to fund day-to-day operations and to continue product development. (*Id.*)

In December 2005, Midway shut down Ratbag—four months after the acquisition that

Defendants (Zucker, in particular) had publicly touted as bolstering Midway's capabilities for in-house development of multi-genre action games. (*Id.* ¶¶8, 38, 40.) Plaintiffs assert that the decision to shut down Ratbag was made in "late October 2005" without specifying any basis at all for their asserted chronology. (*Id.* ¶38.) Plaintiffs allege that Defendants' true, "undisclosed strategy" was to acquire Ratbag's customer base, not its product developers or its products. (*Id.*) Midway's management also concluded that it would be more cost-effective to shut down Ratbag than to integrate its computer systems with Midway's. (*Id.* ¶38.) At the same time, management fired thirty product developers located at Midway's San Diego, California campus. (*Id.*) On December 16, 2005, Midway announced that it had incurred approximately $13 million in restructuring charges for 2005. (*Id.* ¶¶8, 38.) These charges were the result of closing down Ratbag and firing the San Diego product developers. (*Id.*)

In November 2005, Midway cancelled its contract with Stainless Steel for the development of *Rise & Fall* and brought the project in-house. (*Id.* ¶¶9, 37.) Since PC games were not a significant part of Midway's business, it had to increase its investment in PC-game development to accommodate the project. (*Id.* ¶37.) *Rise & Fall* was also plagued with an abnormally high number of bugs (approximately 1,800) when Midway took over development, and this required Midway to devote additional development resources to fixing them in time for the game's promised release date in June 2006. (*Id.*) Plaintiffs allege that Defendants "concealed that Midway would be forced to invest millions of dollars of additional internal product development resources for PC-based products between November 2005 and June 2006" as a result of bringing the development of *Rise & Fall* in-house. (*Id.* ¶9.)

### *Defendants' Stock Sales*

By closing Ratbag and cancelling the Stainless Steel contract, Midway "incurred, and

would continue to incur, millions of dollars of incremental costs." (*Id.* ¶10.) According to

Plaintiffs, Defendants knew that these missteps would soon force Midway into a dilutive

convertible debt offering in order to raise capital for day-to-day operations. (*Id.*) And

Defendants "took full advantage of this undisclosed reality," selling 782,950 shares of their

Midway stock for $15.3 million. (*Id.*) They sold nearly all of their shares (740,450 shares for

$14.7 million) between December 19, 2005 and January 6, 2006. (*Id.*) By December 29, 2005,

when Sumner Redstone clarified his intentions regarding Midway, Defendants had already sold

490,450 shares for $10.3 million. (*Id.* ¶11.)

### *Sumner Redstone*

Plaintiffs attribute the inflated price of Midway stock and its subsequent "precipitous

decline" to the actions of Sumner Redstone, the chairman of Viacom and controlling shareholder

of Midway. Redstone had announced, at some point prior to the Class Period, that he was

evaluating Midway as a potential acquisition target for Viacom. (*Id.* ¶12.) At the same time, he

started acquiring large blocks of Midway shares in open-market transactions. (*Id.*) Plaintiffs

acknowledge that "[t]he market considered the information regarding Redstone important." (*Id.*

¶13.) Indeed, on March 1, 2005, Wedbush Morgan Securities opined that Redstone's "massive

purchases" had caused Midway's shares to be "somewhat overvalued." (*Id.*) And on March 23,

2005, Wall Strategies opined that "if Redstone decides that Midway is not a suitable growth

vehicle in the years to come, he could dump his shares on the open market, thus depreciating

Midway's share price." (*Id.*) On December 29, 2005, Redstone announced that he had pledged

over 33 million of his Midway shares to Sumco, one of his privately held corporations, to

collateralize a $425 million personal loan—and that Midway would not be acquired by Viacom.

(*Id.* ¶¶11, 33-35, 48-50.) Midway stock immediately began to lose value "as Redstone's

accumulation of Midway stock abruptly halted and market expectations of an acquisition by Viacom or a 'going private' transaction fizzled." (*Id.* ¶50.) During January and February 2006, Midway's stock price experienced a "precipitous decline of over 50%." (*Id.* ¶35.) By the end of May 2006, Midway stock traded at $7 per share, down from $20 per share in late December 2005. (*Id.* ¶14.)

### Defendants' False and Misleading Statements

Plaintiffs set forth, in some detail, what they describe as a "number of partial disclosures [by Defendants] which had the effect of dissipating some, but not all, of the artificial inflation from Midway's stock price." (*Id.* ¶15.) For example, they point to the Form 8-K Midway filed with the SEC on December 16, 2005, announcing the $13 million in restructuring costs and the layoff of the Ratbag developers. (*Id.* ¶¶15, 46.) In the next two trading days, Midway shares fell from $23.25 to $20.97, "as artificial inflation *partially* dissipated from the stock price." (*Id.* ¶47, emphasis added). All in all, Plaintiffs allege ten such "false and misleading statements" during the Class Period and attribute them either to Zucker (*Id.* ¶¶39, 40, 44, 52) or to Powell (*Id.* ¶¶52, 57) or to "Defendants," without further specification. (*Id.* ¶¶42, 43, 46, 51, 56.) The court will recount the details of these statements below, as they become relevant to its analysis. With these statements, Defendants "maintained the illusion that Midway's cash position was strong . . . just long enough to sell almost all of their personal holdings of Midway stock [i.e., by January 6, 2006] before lowering the boom on unwitting investors on May 24, 2006." (*Id.* ¶17.) On that day, Defendants finally "admitted" that Midway was "cash strapped" and that the statements they had made throughout the Class Period, concerning Midway's cash position, had been "utterly false." (*Id.*) This alleged admission came in the form of Midway's announcement that it had priced the offering of its $75 million of Convertible Senior Notes due 2026. (*Id.* ¶59.) The

market was "shocked" by this news, and in two days, Midway's stock fell 17.4%, from $9.87 to $7.39, "as the artificial inflation dissipated from the stock price." (*Id.* ¶¶17, 61.)

## LEGAL STANDARD

In considering a Rule 12(b)(6) motion to dismiss a § 10(b) action, the court must accept as true all factual allegations in the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 2509 (2007) ("*Tellabs II*"). The court must consider the complaint in its entirety, along with any documents it incorporates by reference and any facts of which the court may take judicial notice. *Id.*

Under the PSLRA's heightened pleading standards, a private securities complaint alleging that the defendant made a false or misleading statement must (1) "specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1); and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *id.* at § 78u-4(b)(2). *Tellabs II*, 127 S. Ct. at 2508.

## ANALYSIS

### *Standing of Lead Plaintiffs*

The court begins with a threshold matter: Defendants correctly argue that Pappas and Dimizio, the putative class representatives, lack standing to complain about any statements or actions post-dating their final purchase of Midway stock. Plaintiffs' own submissions put the date of that purchase at November 23, 2005. (R. 28, Ex. B at 2.) Any statements made by Defendants after November 23, 2005 are therefore not actionable.

Plaintiffs contend that they have standing to pursue a § 10(b) claim—regardless of the timing of their final purchase—because they have alleged a "fraudulent scheme and course of

business" that persisted throughout the class period.  *See, e.g.*, *Upton v. McKerrow*, 887 F. Supp. 1573, 1577 (N.D. Ga. 1995) (holding that plaintiff had standing to bring action for statements made after final purchase where common scheme to defraud is alleged); *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 13-14 (D. Mass. 2004) (same).  However, they cite no authority from this circuit and fail to distinguish Seventh Circuit precedent that says otherwise.

The Seventh Circuit has explicitly held that "post-purchase statements cannot form the basis of Rule 10(b)-5 liability, because the statements could not have affected the price at which plaintiff actually purchased."  *Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992).  This rule is well settled and unambiguous, and district courts in this circuit routinely reject Plaintiffs' common-course-of-fraudulent-conduct argument and its accompanying citations.[1]  Plaintiffs offer no plausible grounds for distinguishing the facts of *Roots* from the allegations in their complaint; nor do they offer any basis for their vague misdescription of the statements in *Roots* as "un-interrelated."  (Opp'n at 4.)   In *Roots*, the plaintiffs advanced a fraud-on-the-market theory and alleged that the defendants issued false and misleading statements about the company's expected profits and overall business outlook, which "artificially inflated the market price" of the company's stock until the truth was revealed.  *See* 965 F. 3d at 1415-16. That is exactly what Plaintiffs allege in their complaint.  Plaintiffs therefore lack standing to bring a § 10(b) suit based on any statements or conduct after their final purchase of Midway stock on November 23, 2005.

---

[1] *See, e.g.*, *In re Guidant Corp. Sec. Litig.*, No. 05 C 1658, 2008 WL 540848, at *9-10 (S.D. Ind. Feb 27, 2008) ("though the law of other jurisdictions may indeed permit a plaintiff, in some cases, to bring a § 10(b) claim based in part on post-purchase statements, the Seventh Circuit's pronouncements to the contrary in *Roots* appears to us to be unequivocal"); *In re Career Educ. Corp. Sec. Litig.*, No. 03 C 8884, 2006 WL 999988, at *2-3 (N.D. Ill. Mar. 28, 2006) (applying *Roots* to hold plaintiff lacked standing to assert § 10(b) claim for post-purchase statements); *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 705-06 (N.D. Ill. 2005) (same); *Ong v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871, 895-96 (N.D. Ill. 2004) (same); *In re Discovery Zone Sec. Litig.*, 169 F.R.D. 104, 112 (N.D. Ill. 1996) (applying *Roots* to reject "common course of fraudulent conduct" argument as means to extend class period beyond date of class representative's final stock purchase).

Plaintiffs have also requested leave to amend their complaint, should the court hold that they lack standing to pursue any of their claims. This request is denied. Plaintiffs have ignored binding and well-settled precedent and have had ample opportunity to proffer putative class representatives with standing to complain of the statements made in 2006. They were put on notice of this specific defect in their complaint when Defendants moved for dismissal, and that— at the latest—was the appropriate time to seek leave to amend; they are not "entitled to wait and see what the district court [says] before making any changes to the complaint—because it would impose unnecessary costs and inefficiencies on both the courts and party opponents." *Pugh v. Tribune Co.*, 521 F.3d 686, 698 (7th Cir. 2008) (quoting *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 57 (1st Cir. 2008) ("The plaintiffs do not get leisurely repeated bites at the apple, forcing a district judge to decide whether each successive complaint was adequate under the PSLRA.")). Plaintiffs' § 10(b) claim is therefore limited to the statements made on August 4 2005, and November 1 and 7, 2005.[2]

### *False and Misleading Statements/Omissions*

Rule 10b-5 forbids an individual "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). In the complaint, a plaintiff must "specify each statement that is allegedly misleading, the reasons why it is so, and, if based on information and belief, what specific facts support that information and belief." *Tellabs I*, 437 F.3d at 595. The materiality of a statement depends on the significance a

---

[2] Defendants also argue that Plaintiffs' factual allegations patently fail to connect Defendants Allison, Boyle, Irribarren, or Powell to any actionable statements without relying on the so-called group pleading presumption that the PSLRA effectively abolished, at least in this circuit. *See Makor Issues & Rights, LTD. v. Tellabs, Inc.*, 437 F.3d 588, 602-03 (7th Cir. 2006) ("*Tellabs I*"), *vacated on other grounds*, *Tellabs II*, 127 S. Ct. 2499; *Makor Issues & Rights, LTD. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("*Tellabs III*") (explicitly "not disturb[ing]" this ruling on remand). The court need not consider this argument since, for the reasons given below, the disputed statements do not support § 10(b) liability, no matter who made or is alleged to have made them.

reasonable investor would place on the withheld or misrepresented information. *Id.* at 596.

"[T]here must be a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Id.* (internal quotation marks omitted). "The crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company. If the statement amounts to vague aspiration or unspecific puffery, it is not material." *Id.*

The statements at issue fall into two categories. First, there are Defendants' statements about Midway's acquisition of Ratbag. On August 4, 2005, Midway announced the acquisition in a press release, in which Zucker commented:

> This transaction is consistent with our strategy of adding depth to our internal product development organization and strengthening our ability to deliver high-quality, compelling and commercially successful content for current and future systems. Ratbag brings to Midway a rare combination of development expertise in driving and on-foot combat that they are incorporation into our games now in development.

(Consol. Am. Compl. ¶39.) That same day, Zucker also commented on the acquisition during a conference call. (The complaint does not say with whom.) He said:

> We announced this morning the acquisition of the Ratbag Holdings, an Australian developer who expands our internal product development capabilities overseas. We are working closely with Ratbag in one of our key titles for next year. We believe with this is an opportunity to establish our development presence [in] the midst of the great pool of talent in Australia, and bring to Midway technical expertise and experience that will specifically help facilitate our development of multi-genre action games. We look forward to announcing the projects that our new Midway Studios Australia is developing.

(*Id.* ¶40.)

These statements convey nothing more to the would-be investor than the aspiration that

acquiring Ratbag would advance Midway's strategic objectives; talk of "strengthening" and "facilitating" and "adding depth" and "expertise" falls far short of the threshold for concrete, materially false or misleading statements. Rather, these statements fall squarely within the category of "[v]ague statements about industry leadership and unquantified growth [that] are classic puffery, and are generally not actionable." *See Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 905 (N.D. Ill. 2001), *aff'd*, 269 F.3d 806 (7th Cir. 2001); *Tellabs I*, 437 F.3d at 597 (comparing optimistic puffery about projected growth and product demand with specific statement that demand for product "continue[s] to maintain its growth rate"). Defendants' statements that internal product development would be critical to Midway's business model and continued success do not—Plaintiffs' assertions to the contrary—render their statements about the acquisition of Ratbag more than a mere attempt to "put a rosy face on an inherently uncertain process." *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997) (optimistic sales predictions are immaterial puffery); *Roth v. OfficeMax, Inc.*, No. 05 C 236, 2006 WL 2661009, at *4 (N.D. Ill. Sept. 13, 2006) ("combined office products business will be strategically stronger and better able to deliver compelling value to its customers through all channels and across all segments" deemed puffery); *Sutton v. Bernard*, No. 00 C 6676, 2001 WL 897593, at *3 (N.D. Ill. Aug. 9, 2001) ("[t]he combination of our two dynamic cultures and their extraordinary success stories gives us amazing competitive strengths" deemed puffery); *In re Newell Rubbermaid Inc. Sec. Litig.*, No. 99 C 6853, 2000 WL 1705279, at **2, 7 (N.D. Ill. Nov. 14, 2000) (statements that merger "would create synergies, a 'stronger combined presence,' 'broader acquisition opportunities,' and a better ability to serve Europe" deemed puffery). Plaintiffs have failed to show that Defendants said or did anything more than publicly adopt a hopeful posture that its strategic plans would pay off. Such preening for the financial press is classic puffery.

Even if these statements were not puffery, Plaintiffs cannot establish that they were false *when made*. Defendants falsely claimed that the Ratbag acquisition was part of a "strategy of adding depth to our internal product development organization," Plaintiffs allege, because their real yet "undisclosed" plan was to acquire Ratbag's customer base without acquiring any of its products or product developers, at least not for more than four months. (Consol. Am. Compl. ¶¶38, 40-41.) Plaintiffs' only putative support for this allegation suffers from a basic chronological confusion: As Plaintiffs contend, "[t]he Complaint sufficiently alleges why these statements were false when made *as by October 2005*, Midway had already decided to terminate Ratbag's product developers and close the business down." (Opp'n at 11, emphasis added.) Obviously this fact, on its own, cannot establish that the decision had been made, or even contemplated, by *August* 2005. Moreover, while Plaintiffs have alleged facts showing that Midway shut down Ratbag in December 2005, they offer no factual basis for their claim that the decision to do so was made in October. (*Id.*; Consol. Am. Compl. ¶38.) This bald assertion does not satisfy the particularity requirements of the PSLRA.

Plaintiffs also allege that by omitting the following "adverse facts," Defendants rendered their statements—indeed, *all* of their pre-November 23, 2005 statements—materially misleading: *first*, Midway acquired Ratbag for the purpose of obtaining its customer base, not its products or product developers, and always intended to close Ratbag "within months" of acquiring it; *second*, Midway would incur $13 million in incremental costs by closing Ratbag and firing the San Diego developers, creating additional cash needs for the company; *third*, as a result of the ensuing "desperate need for working capital," Midway would be forced into a $75 million convertible debt offering. (Consol. Am. Compl. ¶¶42, 45.)

Plaintiffs' contention that the statements about Ratbag were materially misleading when

made founders on the same temporal problem as their contention that the statements were false, as Plaintiffs continue to point to precisely the same fact: the "undisclosed plan" to buy Ratbag on the premise that owning a company for four months and then shutting it down at a $13 million loss is a plausible strategy for acquiring the target company's customer base. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990) ("[I]ndulging ready inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud. One who believes that another has behaved irrationally has to make a strong case."). Again, Plaintiffs do not allege any facts contemporaneous to the statements to support their theory that the "plan" had already been hatched—or that Midway's eventual debt offering was, at that time, a knowable consequence of the "plan" and the mounting need for cash it would create. In sum, Plaintiffs have alleged no facts (as opposed to conclusions) that Defendants' statements relating to the acquisition of Ratbag were false or misleading when made, or even material; thus, they have asserted no factual basis for § 10(b) liability against Defendants.

The second category of statements comprises revenue and earnings guidances released in August and November 2005. During the August 4 conference call, Zucker announced:

> Turning to guidance. Partially due to the shortfall from the second quarter results, and also from our decision to move the release of our next premium PC title, The Rise and Fall Civilizations at War into the first quarter of 2006, we're revising our full year revenue guidance to approximately 200 million, down from previous estimate of with 225 million, and increasing our net loss to approximately 60 million from our previous estimate of 47 million.

(Consol. Am. Compl. ¶40.) On November 1, 2005, Midway announced further revisions in a press release:

> For the year ending December 31, 2005, Midway has revised its net revenue expectations in part due to re-scheduling certain products into 2006 from the fourth quarter of 2005, as well as lower-than-expected retailer reorders for several recently released titles, including *The Suffering: Ties That Bind and L.A. RUSH*. As such, for the year ending December 31, 2005, the Company now expects net revenues of

- 13 -

> approximately $145 million, compared with the Company's previous estimate of net revenue of $200 million. Additionally, the Company now expects a 2005 full year net loss of approximately $95 million compared with its prior guidance for a net loss of approximately $60 million.

(*Id.* ¶42.)  The company issued another press release approximately one week later, on November 7, 2005, in which it repeated this statement verbatim and added that "For the quarter ending December 31, 2005, the Company expects net revenue of approximately $65 million, with a net loss of approximately $20 million."  (*Id.* ¶43.)   That same day, Defendants held a conference call in which Zucker again reiterated the substance of the November 1 and November 7 press releases and added that Midway "expect[s] to end the year [with] between $95 to $100 million in cash on the balance sheet."  (*Id.* ¶44.)  The rest of his remarks on the conference call were obvious puffery and Plaintiffs have not challenged them.

Plaintiffs allege that all of the revenue and earnings guidances were false or materially misleading when made and that Defendants knew as much: "defendants lacked any reasonable basis to represent expected losses of $20.0 million and $95.0 million for 4Q05 and FY05, respectively, because ***prior*** to making those statements, they had already decided to shut down Ratbag and terminate its developers (along with other San Diego, California based product developers)."  (Opp'n at 12; Consol. Am. Compl. ¶¶38, 45-46.)  *See Katz v. Household Int'l, Inc.*, 91 F.3d 1036, 1040 (7th Cir. 1996) (earnings forecast may be actionable as securities fraud if it is made without a "reasonable basis").  Thus, Defendants reason, the November guidances should have reflected the financial consequences of the decision to close Ratbag.

Plaintiffs again rely on their conclusory allegation that Defendants' "undisclosed plan" was hatched in October 2005.  That chronology could not impugn the August guidance, even if Plaintiffs provided some factual basis for this timeline.  But they do not; indeed, they allege only one fact that relates to the timing of the decision to close Ratbag: the Form 8-K filed on

- 14 -

December 16, 2005 states that "*[o]n December 14, 2005*, the Company's Board of Directors committed to a plan to reduce the Company's cost structure and increase product development synergy and efficiency" and then announces Midway's plan to close Ratbag and reduce its workforce by 8-11%. (Consol. Am. Compl. ¶46, emphasis added.) Plaintiffs seem to infer from this that the decision to close Ratbag must have been made sometime in October, since the guidances issued in early November were revised to reflect the closing of Ratbag "***a mere five weeks***" later, on December 16, 2005. (Opp'n at 12, double emphasis in original.) This non-sequitur does not support Plaintiffs' bald allegation that the decision to close Ratbag had in fact been made prior to the November guidances; even less does it show that the financial consequences of that decision were known, or could have been known, at the time those guidances were issued. Plaintiffs thus fail to plead the "when" of Defendants' alleged fraud with enough particularity—or lack of outright confusion—to satisfy either the PSLRA or Fed. R. Civ. P. 9(b). *See DiLeo*, 901 F.2d at 627 (Rule 9(b) required securities-fraud plaintiff to allege "the who, what, when, where, and how: the first paragraph of any newspaper story").

Thus, nothing in the complaint supports Plaintiffs' contention that any of the guidances were made without a "reasonable basis." Or put differently, Plaintiffs have not alleged facts "sufficient to support a reasonable belief as to the misleading nature of" any statements made by Defendants. *See Tellabs I*, 437 F.3d at 595. The facts alleged cannot support the conclusion that the guidances failed to reflect any information they should have reflected, and Plaintiffs do not allege that Defendants based the revisions announced in the November guidances on anything other than what they claimed to base them on, namely, lower-than-expected reorders and delayed release dates for new products. As for Zucker's forecast that Midway would end the year 2005 with $95-$100 million in cash, Midway ended with $98,376,000. (R. 77, Ex. 5 at 2.) This lack

of any false or materially misleading statement is an adequate basis for dismissal. *See, e.g.*, *Gallagher v. Abbot Labs.*, 269 F.3d 806, 808 (7th Cir. 2001) ("What sinks plaintiffs' position is their inability to identify any false statement—or for that matter any truthful statement made misleading by . . . omission.").

Plaintiffs' inability to cite a single fact earlier than the announcement in the Form 8-K as support for their hypothesis of an "undisclosed plan" betrays the fraud-by-hindsight theory that quietly fuels their complaint. *See DiLeo*, 901 F.2d at 627-28 ("The story . . . is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud."). This is precisely what the heightened pleading requirements of the PSLRA were designed to foreclose.

### Scienter

Although Plaintiffs' failure to adequately allege any material misrepresentation or omission by Defendants is an adequate basis for dismissal, consideration of the particular difficulties that plague Plaintiffs' scienter allegations further highlights the fundamental deficiencies in the complaint.

The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference" that each named defendant acted with "intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). For "forward-looking statements—predictions or speculations about the future," however, "actual knowledge of falsity, not merely indifference to the danger that a statement is false, is required for liability." *Tellabs III*, 513 F.3d at 705 (citing 15 U.S.C. § 78u-5(c)(1)(B)(ii)). The proper inquiry is "whether all

the facts alleged, taken together, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs II*, 127 S. Ct. at 2509. An inference of scienter is "strong" only if it is "cogent and compelling, thus strong in light of other explanations." *Id.* at 2510. Thus, a § 10(b) complaint will survive a motion to dismiss only if the inference of scienter is "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

Plaintiffs argue that two factors, taken together, support a strong inference of scienter: *first*, "Defendants may be imputed with either knowing about or recklessly disregarding matters concerning key decisions that effect [*sic*] the Company," namely, the cancellation of the Stainless Steel contract and the decision to shut down Ratbag; *second*, Defendants engaged in "unusual and suspicious insider trading." (Opp'n at 5.)

Plaintiffs first "impute" scienter to Defendants on the basis of a "core-operations theory:" Defendants can be credited with knowledge of the facts surrounding the Stainless Steel and Ratbag decisions because Defendants are "key officers" of Midway and these decisions involved "core operations of the company." (Opp'n at 6.) Indeed, these two "key, strategic decisions . . . form the crux of defendants' Class Period scheme to mislead investors about the Company's cash needs." (*Id.* at 5.) Even assuming *arguendo* that Plaintiffs' theory is viable in this circuit, it speaks only to the question of *who* can be credited with knowledge of these decisions; it leaves open the question of *when* anybody knew anything. The complaint's basic chronological defects preclude any finding that the decision to close Ratbag is evidence of scienter in connection with the August or November statements: Plaintiffs, at the risk of belaboring the point, do not sufficiently allege that the decision had already been made when these statements were issued.

Plaintiffs also cite the decision to cancel the Stainless Steel contract and develop *Rise & Fall* in-house as evidence that Defendants intended to mislead the public with the November guidances: Defendants, they say, knew or recklessly ignored the possibility that this decision would result in millions of dollars in incremental costs, drain Midway's working capital to the breaking point, and ultimately require the company to issue $75 million in convertible debt in May 2006. (*Id.* at 6; Consol. Am. Compl. ¶¶9, 55, 58.) Curiously, though, Plaintiffs do not claim that the November guidances—as opposed to statements made in February and May 2006—were rendered false or materially misleading by Defendants' failure to disclose these "adverse facts." (*Id.* ¶¶41, 45, 55, 58.) In effect, Plaintiffs argue that Defendants intended to deceive the public with the November guidances by withholding information, the absence of which did not render the guidances false or misleading in the first place. Taken together, these aspects of the complaint are incoherent.

Moreover, Plaintiffs again fail to allege the "when" with sufficient particularity to support an inference of scienter in connection with the November guidances. This inference requires that Defendants knew—by November 1 or November 7, 2005—that the financial consequences of cancelling the Stainless Steel contract and developing *Rise & Fall* in-house would render the guidances false or misleading. *See Tellabs III*, 513 F.3d at 705 (15 U.S.C. § 78u-5(c)(1)(B)(ii) requires actual knowledge of falsity for liability premised on "forward-looking statements" like predictions). But no specific facts in the complaint support the conclusion that Defendants had even decided to cancel the Stainless Steel contract by November 1 or 7— Plaintiffs allege only that the decision was made "in November 2005" or "during November 2005," without further specification. (Consol. Am. Compl. ¶¶9, 55, 58.) Even less do any specific facts support the conclusion, for example, that Defendants already knew that *Rise & Fall*

contained an "abnormal[ly] high number of bugs," or that the cost of developing the game in-house would leave Midway "in desperate need for working capital," or that this cash shortage would require a $75 million convertible debt offering in May 2006. (*Id.* ¶¶9, 55, 58.) Given the facts as pled, none of these developments can support Plaintiffs' inference that Defendants intended to mislead the public on November 1 or 7, 2005. In essence, Plaintiffs complain that the decision to develop *Rise & Fall* in-house proved disastrously bad; Midway, as it turned out, was not up to the task without making costly investments in product-development infrastructure. Plaintiffs once again allege fraud by hindsight.

Lastly, Plaintiffs contend that Defendants' "unusual and suspicious insider trading" in December 2005 supplies "circumstantial evidence" that Defendants intended to deceive the public in their August and November 2005 statements. *See Tellabs I*, 437 F.3d at 604. What makes Defendants' stock sales "unusual and suspicious" is, of course, the timing: "they sold nearly all their stock immediately before the single largest shareholder, Redstone, announced that he had been accumulating Midway stock to collateralize a personal loan." (Consol. Am. Compl. ¶62.) That revelation caused a "precipitous decline" in the value of Midway shares. (*Id.* ¶¶35, 50.) The timing of Defendants' extensive stock sales vis-à-vis Redstone's announcement does seem a little too perfect, and Defendants may well have possessed and traded on knowledge of Redstone's plan before it was announced to the public. So Plaintiffs are correct that a strong inference of motive may be drawn from the facts alleged—but it would be a motive to hush up about Redstone's plan and sell their shares before he went public with it, not a motive to commit the specific fraud alleged in the complaint, i.e., to misrepresent the state of product development, cash flow, and capital reserves at Midway. Defendants' alleged fraud has no meaningful relation to the information that sent the price of Midway shares tumbling when it was disclosed, and it

offers no explanation of why Defendants sold large blocks of their Midway shares immediately

before that information was disclosed.  If, however, Plaintiffs intend to argue that Defendants

were engaged in an ongoing scheme since August or November to inflate the value of Midway

stock with their alleged misrepresentations *because* they knew Redstone would announce his

unfavorable intentions in December—an implausible scenario to say the least—Plaintiffs would,

at a minimum, have to allege facts showing that Defendants knew of Redstone's intentions when

they issued their August or November statements.  They have not alleged any such facts.  Thus,

the stock sales do not support an inference that Defendants intended to deceive the public about

the state of affairs at Midway.  That inference of scienter is weak and ill-supported in its own

right, and it is far from "strong in the light of other explanations."  *See Tellabs II*, 127 S. Ct. at

2510.  Defendants offer their own detailed explanation, on which the timing of their stock sales

vis-à-vis Redstone's announcement is wholly fortuitous.  But there is no need to consider that

explanation here; Plaintiffs have not, in any event, adequately pled a knowing fraud, and their

complaint must be dismissed.

### *§ 20(a) Control-Person Liability*

Claims under § 20(a) of the Securities Exchange act of 1934 are "derivative, requiring

proof of a separate underlying violation of the Exchange Act."  *Tellabs I*, 437 F.3d at 605

(citations omitted); *see* 15 U.S.C. § 78t(a).  Plaintiffs have not adequately alleged the direct

liability of any defendant, so their § 20(a) claim must also be dismissed.  *See Pugh*, 521 F.3d at

698 (dismissal of § 10(b) and Rule 10b-5 claim mandates dismissal of § 20(a) claim).

### <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss the Consolidated Amended

Class Action Complaint is GRANTED.

Enter:

/s/ David H. Coar

_____

David H. Coar

United States District Judge

**Dated: October 19, 2009**